## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| **RAYMOND A. KOLB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:08-00985** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 9 and 11.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 2 and 3.)

The Plaintiff, Raymond A. Kolb (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on July 25, 2003 (protective filing date), alleging disability as of November 4, 2001, due to a back injury with chronic pain. (Tr. at 21, 81-83, 102, 420-23.) The claim was denied initially and upon reconsideration.[1] (Tr. at 32-35, 36-37, 41-42, 425-26.) On January 28, 2004, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 46.) Hearings were held on May 12, 2005, and August 9, 2005, before the Honorable Steven A. DeMonbreum. (Tr. at

---

[1] Claimant filed previous applications for DIB on April 8, 2002, and SSI on July 25, 2003, also alleging disability as of November 4, 2001. (Tr. at 21.) The applications were denied administratively with no appeal taken to the hearing level. (*Id.*)

427-30 and 431-78.) By decision dated December 29, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 21-31.) The ALJ's decision became the final decision of the Commissioner on June 12, 2008, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On August 11, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain

v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the

claimant, considering claimant's age, education, work experience, skills and physical shortcomings,

has the capacity to perform an alternative job, and (2) that this specific job exists in the national

economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

       In this particular case, the ALJ determined that Claimant satisfied the first inquiry because

he had not engaged in substantial gainful activity since the alleged onset date, November 4, 2001.

(Tr. at 24, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from

degenerative disc disease with surgery at L5-S1 and a history of headaches, which were severe

impairments. (Tr. at 24, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's

impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25,

Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for a limited

range of light work as follows:

> [T]he claimant has the residual functional capacity (RFC) to perform a limited range
> of light work. Specifically, the claimant can lift or carry 20 pounds occasionally, 10
> pounds frequently; sit, stand, or walk about 6 hours each in an 8 hour day, and
> perform occasional climbing, balancing, stooping, kneeling, crouching, and crawling.
> The claimant has no manipulative, visual, communicative, or environmental
> limitations.

(Tr. at 27, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past

relevant work. (Tr. at 29, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a

messenger and an usher at the light level of exertion, and as a telephone interviewer and bench

worker at the sedentary level of exertion. (Tr. at 29-30, Finding No. 10.) On this basis, benefits were denied. (Tr. at 30, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on January 22, 1967, and was 38 years old at the time of the administrative hearing, August 9, 2005. (Tr. at 29, 81, 437.) Claimant had a ninth grade, or limited, education, and was able to communicate in English. (Tr. at 29, 107, 438.) In the past, he worked as a cook, carpenter, stocker, warehouse worker, ski lift operator, and an assistant manager. (Tr. at 29, 114-20, 439-41, 469-70.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the ALJ erred in (1) assessing Claimant's pain and credibility, (2) according Dr. Kropac's opinion regarding Claimant's functional capacity little weight, and (3) failing to find that Claimant suffered a severe mental impairment. (Document No. 10 at 4-19.) The Commissioner asserts that the ALJ's decision is supported by substantial evidence and that Claimant's arguments are without merit. (Document No. 11 at 8-16.)

Analysis.

1. Pain and Credibility.

Claimant first alleges that the ALJ erred in assessing his pain and credibility. (Document No. 10 at 5-15.) Claimant asserts that the ALJ's pain analysis lacks any rationale and that the ALJ failed to analyze "the record consistent with the regulations and rulings." (Id. at 6.) Specifically, Claimant asserts that though the ALJ discussed Claimant's daily activities, he did not discuss how he engaged in such activities and concluded in a cursory manner that his activities were inconsistent with his allegations of pain. (Id. at 6-7.) Claimant also asserts with respect to his activities that the ALJ placed undue weight on his household activities in assessing his ability to hold a job outside the home. (Id. at 7-8.) Claimant further asserts that the ALJ made specific "overly broad statements regarding other facts, without a true basis for them." (Id. at 8.) Particularly, Claimant asserts that the ALJ concluded that because he had some suntan due to sitting on his porch, that statement was inconsistent with Claimant's alleged sitting limitations. (Id.) Similarly, the ALJ repeated that

Claimant lived on a 300 acre farm, but the record indicated that it was not a working farm. (Id. at 9.) Furthermore, the ALJ noted in his decision that Claimant cared for his autistic brother in Florida for a couple of months, which suggested that Claimant could perform a lot of activities. (Id. at 9-10.) The record however, demonstrated that Claimant only sat with his brother and did not provide him much care. (Id. at 10.)

Claimant also alleges that the ALJ improperly concluded that because Claimant did not have any positive neurological findings after his back surgery, then his complaints of pain were unsupported. (Id. at 10-11.) Claimant asserts that "even in light of normal examinations post-surgery, . . . an individual can suffer significant pain, due to a multitude of causes." (Id. at 10.) Claimant states that he consistently complained to various examiners over time about the nature and extent of his pain and functional limitations. (Id.) Similarly, Claimant asserts that the ALJ erred in discussing the treatment that Claimant underwent. (Id. at 11.) Claimant noted that he underwent surgery, tried epidural injections, used a TENS unit, laid down, used lidocane patches, and took medication. (Id.) His physicians did not recommend any further surgical intervention, but concluded "that treating his pain conservatively is all that is left to do at this point. The ALJ's conclusion is that he only receives conservative care now, and therefore, his pain cannot be that severe. Clearly, that is not accurate." (Id.) He asserts that the ALJ disregarded Claimant's subjective complaints and expressed his own medical opinion concerning the seriousness of Claimant's impairments, and therefore, failed in his duty to analyze properly the pain complaints and Claimant's credibility pursuant to the regulations and rulings. (Id. at 13-15.) In summary, Claimant asserts that he "has a rather limited, sedentary lifestyle, suffers from pain significant enough that he cannot sustain a normal work routine, and is thus, unable to work due to his exertional and nonexertional limitations

6

caused by his post surgical chronic back condition." (Id. at 12.)

In response, the Commissioner first asserts that the objective medical evidence does not support Claimant's subjective complaints of limitations and supports the ALJ's determination that Claimant could perform light work. (Document No. 11 at 10.) The Commissioner notes that the evidence of record demonstrates that Claimant was treated conservatively for pain, that he underwent a successful surgery in August, 2002, and that post-operatively, he showed significant improvement. (Id.) Neurological testing essentially was normal post-operatively, with the evidence demonstrating negative straight leg-raising tests, good range of lumbar motion, normal motion on extension with some leg pain, and an absence of sensory or motor deficits by December, 2002. (Id.) By March, 2003, Claimant developed low back and right leg pain after "wrestling" with his son, but a lumbar MRI revealed no disc herniations or nerve root compression. (Id.) Physical examinations again revealed essentially normal findings. (Id. at 10-11.) The Commissioner notes that in February, 2004, a MRI revealed no disc recurrence at L5-S1 and Dr. Greenberg advised of no need for further surgical intervention. (Id. at 11.) Similarly, Dr. Kropac reported in May, August, November, and February, 2005, that Claimant was able to heel and toe walk without evidence of weakness. (Id.) The last MRI, in April, 2005, demonstrated a decreasing bulging disc at L5-S1 with no significant herniation or evidence of recurrent disc herniation. (Id.) Thus, the Commissioner asserts that "the objective medical evidence is significant for great improvement following surgery, normal MRIs, and improved neurological examinations." (Id.)

The Commissioner further asserts that Claimant's daily activities did not support his subjective complaints. (Id. at 13.) The Commissioner states that Claimant attempts to minimize in his brief the time he spent sitting on his porch, but admitted to tanning by sitting on his porch. (Id.)

Moreover, Claimant "admitted that he performed some part-time work as a cook and ski lift operator in 2002 and 2003; traveled to Florida to care for his autistic brother in 2005; drove; watched movies; took care of his personal hygiene, and performed household chores." (Id. at 13-14.) The Commissioner asserts that though Claimant disputes the degree of care given to his brother, "the fact that [Claimant] could travel to another state and be placed in a position of care for or supervise his autistic brother shows that he was not precluded from working." (Id. at 14.) The Commissioner notes Claimant's further self-reported activities and asserts that such activities "are hardly the activities of an individual with such a disabling physical condition that he was limited from performing all work." (Id.) Consequently, the Commissioner asserts that in view of "all of the evidence of record, and when considering [Claimant's] wide variety of daily activities, conservative medical care following surgery, improved examinations, and good results from the prescribed medications, the ALJ was correct in his determination that [Claimant's] subjective complaints would not prevent the performance of a reduced range of light work." (Id.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective

medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence

of pain should be gathered and considered, but the absence of such evidence is not determinative.

Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are

considered to diminish her capacity to work to the extent that alleged functional limitations are

reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and

416.929(c)(4) (2006). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your
> prior work record, your statements about your symptoms, evidence submitted by
> your treating, examining, or consulting physician or psychologist, and observations
> by our employees and other persons. . . . Factors relevant to your symptoms, such
> as pain, which we will consider include:
>
> > (i) Your daily activities;
> >
> > (ii) The location, duration, frequency, and intensity of your pain or other
> > symptoms.
> >
> > (iii) Precipitating and aggravating factors;
> >
> > (iv) The type, dosage, effectiveness, and side effects of any medication you
> > take or have taken to alleviate your pain or other symptoms;
> >
> > (v) Treatment, other than medication, you receive or have received for relief
> > of your pain or other symptoms;
> >
> > (vi) Any measures you use or have used to relieve your pain or other
> > symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every
> > hour, sleeping on a board, etc.); and
> >
> > (vii) Other factors concerning your functional limitations and restrictions due to pain
> > or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a

claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless,  Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 27-28.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 28.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 28-29.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible." (Tr. at 28.)

The Court finds that the ALJ properly considered the factors under 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4), in evaluating Claimant's pain and credibility. The ALJ acknowledged Claimant's complaints of back and leg pain, and his ability to sit, stand, or walk for up to twenty minute intervals due to back pain. (Tr. at 28.) The ALJ also noted Claimant's

allegations that bending, stooping, or twisting increased his back pain. (<u>Id.</u>) The ALJ thus noted the nature and location of Claimant's impairments, and further noted Claimant's alleged limitations. The ALJ noted that Claimant successfully underwent surgery on his back and that he was being treated conservatively with prescription medications for his back and leg pain. (Tr. at 28.) The ALJ also noted that Claimant had undergone physical therapy, stretching, conditioning, injections at a pain clinic, use of a TENS unit, and further medications for pain. (Tr. at 26.) Claimant testified that he did not experience any side effects from his medications. (Tr. at 458.)

The ALJ also considered Claimant's activities. (Tr. at 28.) Specifically, the ALJ noted Claimant's testimony that he acquired his tan from sitting on his porch. (<u>Id.</u>) The ALJ interpreted this activity as an ability on Claimant's part to sit for prolonged periods. (<u>Id.</u>) Claimant takes issue with this finding, asserting that "there is no evidence of record as to the extent of his tan, how long it would take to get such a tan, or whether simply sitting in the sun for 10 to 20 minutes a few days a week would cause such a tan." (Document No. 10 at 8.) Claimant notes that "individuals tan at different rates, and some are naturally darker than others." (<u>Id.</u>) Though Claimant is correct that the record is void of evidence as to the extent of Claimant's tan, he testified that his legs were white and that he obtained his tan from "[s]itting on the porch. It's a farm. There's pretty much - - a 300 -acre farm. I sit on the porch. It's not a whole lot more to do." (Tr. at 437.) He subsequently testified that he sat on the porch to keep an eye on the gate to prevent individuals from hunting or trespassing on the farm. (Tr. at 457.) Based on Claimant's testimony, the Court finds that it was not unreasonable for the ALJ to conclude that Claimant was able to sit for extended periods of time. Nevertheless, in view of the totality of the ALJ's pain and credibility assessment, the Court finds that any error the ALJ may have committed in reaching such a conclusion was harmless.

The ALJ also noted that Claimant performed some part time work as a cook and a ski lift operator in 2002 and 2003, that he traveled to Florida to care for his autistic brother, and that he lived on a 300 acre farm. (Tr. at 28.) Claimant also takes issue with the ALJ's statements regarding the care for his brother and the fact that he lives on a 300 acre farm. (Document No. 10 at 9-10.) As the Commissioner notes however, the fact that he was able to travel to Florida to be entrusted with the care of his autistic brother speaks volumes as to his capabilities, regardless of the actual functions he performed for his brother. Though the ALJ noted that Claimant lived on a 300 acre farm, he did not, contrary to Claimant's assertions, state or imply, that Claimant performed any work on the farm, and the record clearly demonstrates that Claimant did not. Claimant's arguments in these regards are without merit.

Finally, the ALJ considered Claimant's daily activities to include driving, renting movies, caring for his personal hygiene, and performing household chores. (Tr. at 28.) Claimant argues that the ALJ failed to discuss the manner in which he performed these activities and the time in which it took him to complete them. (Document No. 10 at 6-7.) Claimant testified that he performed housework, which included doing dishes and "the basic stuff." (Tr. at 453.) He also testified that he loved to cook and that cooking helped him concentrate on other things. (Tr. at 454.) With the exception of falling while cooking, Claimant did not testify as to any limitations in performing these activities. He also testified that it took him twenty minutes to shop for groceries. (Tr. at 455.) He further testified that he cared for his personal needs, but he took his time in doing so, noting that it was difficult for him to put on his pants. (Tr. at 453.) Though Claimant took his time in caring for his personal needs, nothing in the record suggests that Claimant's daily activities consumed so much of his time that they would preclude the performance of light work, and Claimant does not suggest

13

in his brief how long it took him to perform such activities.

As Claimant points out, the ALJ summarized the medical evidence of record, noting Claimant's improvement with continued conservative treatment following surgery on his back. (Tr. at 24-25, 26-27, 28.) The objective medical evidence however, was but one factor on which the ALJ relied in assessing Claimant's pain and credibility. While the ALJ noted negative neurological findings, as discussed above, he also considered the factors set forth in 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). (Id.) The ALJ noted that Claimant was receiving only conservative treatment, but properly noted Claimant's previous treatment, which included surgery, physical therapy, stretching, conditioning, injections at a pain clinic, use of a TENS unit, and medication. (Tr. at 28.)

Accordingly, based on the foregoing, it is clear that the ALJ properly considered the factors under 20 C.F.R. § 416.929(c)(4), in finding Claimant not entirely credible and disabled by pain. Accordingly, the Court finds that the ALJ properly considered Claimant's subjective allegations and that his pain and credibility assessment is supported by substantial evidence

2. Treating Source Opinion.

Claimant next alleges that the ALJ erred in failing to accord greater weight to the opinion of Claimant's treating physician, Dr. Kropac. (Document No. 10 at 15-17.) Claimant asserts that the ALJ gave Dr. Kropac's opinion regarding his RFC little weight because it was not supported by his treatment notes, the MRI, his conservative treatment, and the clinical observations of other physicians, but failed to explain his conclusion. (Id. at 16.) Claimant notes that Dr. Kropac treated him conservatively because nothing else could be done for him; he had "reached the point that conservative medical care is all that is left to treat his condition. Another surgery will not help." (Id.) Claimant further notes that his nerve root is encompassed by scar tissue, which would explain his

14

symptoms. (Id.) The ALJ however, rejected Dr. Kropac's opinion, "while at the same time failing to adequately support his rationale for rejecting it." (Id. at 17.)

The Commissioner asserts that the ALJ considered the restrictions offered by Dr. Kropac in conjunction with all the evidence of record and determined that they were unsupported by the record as a whole and by Dr. Kropac's own notes detailing conservative treatment. (Document No. 11 at 12.) The Commissioner notes that the clinical evidence following surgery was unremarkable and that no other treating physician suggested any restrictions in functioning indicating disability. (Id.) Additionally, Claimant was able to perform a wide range of activities of daily living and was treated only conservatively post-operatively. (Id.) Dr. Kropac noted that Claimant was able to heel and toe walk without weakness and that he had normal reflexes in his lower extremities. (Id. at 12-13.) Furthermore, Dr. Kropac's diagnoses of a back impairment did not "necessarily correlate to functional limitations stemming from those impairments that would limit [Claimant's] ability to work to a degree greater than that determined by the ALJ." (Id. at 13.) The Commissioner also notes that the determination of disability is a legal determination reserved to the Commissioner, and not to the health care provider. (Id.) Finally, the Commissioner asserts that in assessing Claimant's RFC, the ALJ also considered four state agency physician RFC assessments, all of whom opined that Claimant could perform light work. (Id. at 11-12.) He therefore, afforded their opinions great weight, as they were consistent with the other evidence of record. (Id. at 12.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on

all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

16

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2006). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions."

17

Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2006). The ALJ, however, is not bound by any

findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The evidence of record reveals that Claimant treated with Dr. Kropac from April 14, 2004, through February 23, 2005, though the record contains medical records beginning on May 6, 2004. (Tr. at 383-86, 402-09.) On December 14, 2004, Dr. Kropac completed a form Medical Opinion Re

Ability to Do Work-Related Activities (Physical), on which he opined that Claimant was capable of lifting or carrying twenty pounds occasionally and less than ten pounds frequently. (Tr. at 384.) He opined that Claimant was able to sit, stand, or walk less than two hours during an eight-hour day with normal breaks, could sit or stand twenty minutes before changing position, and must walk around every twenty minutes for up to five minutes. (Tr. at 384-85.) Dr. Kropac noted that Claimant needed the opportunity to shift at will from sitting, standing, or walking, and that he sometimes needed to lie down at unpredictable intervals during a work shift for one to three times per shift. (Tr. at 385.) He opined that Claimant could occasionally twist, stoop, crouch, and climb stairs, but could never climb ladders, and that his ability to reach, push, and pull was affected by his impairment. (Tr. at 385-86.) Finally, Dr. Kropac opined that Claimant would be absent from work about twice a month due to his impairments or treatment. (Tr. at 386.)

Dr. Kropac's treatment notes reflect Claimant's reports of constant lower back pain and right lower extremity pain, with some numbness on May 6, 2004. (Tr. at 408.) Claimant reported that his pain was aggravated by motion, bending, stooping, sitting, and standing. (Id.) Physical exam revealed tenderness to palpation over the lower lumbosacral spine and related paraspinal muscle masses, limitation of motion of the lumbosacral spine, positive straight leg raising testing of the right lower extremity, essentially normal sensation of both lower extremities, and an ability to heel and toe walk without evidence of weakness. (Id.) Dr. Kropac diagnosed lumbar disc herniation and status post laminectomy/diskectomy at L5-S1 with residual lower extremity radiculitis. (Id.) He continued Claimant on Robaxin, Orudis, Neurontin, Lortab, and Percocet for breakthrough pain, as well as Ambien for sleep. (Tr. at 409.) No other treatment was recommended. (Id.) Claimant's physical examination and Dr. Kropac's examination, diagnosis, and treatment remained the same on August

5, 2004, November 4, 2004, and February 23, 2005. (Tr. at 402-07.) On August 5, 2004, Claimant reported that overall, his back pain was about the same, and on November 4, 2004, he reported that his lower back and right lower extremity pain had increased progressively. (Tr. at 404, 406.) On February 23, 2005, Claimant reported that his back pain remained the same. (Tr. at 402.)

In addition to Dr. Kropac's opinion, the medical record contains the opinions of four state agency physicians, who all opined that Claimant was capable of performing light work with occasional postural limitations. (Tr. at 299-306, 336-43, 361-68, 369-77.) The record also contains the treatment notes of Dr. Boone, who administered trigger point injections (Tr. at 261-97.); Dr. Carson, who performed right partial hemilaminectomy and microdiskectomy at L5-21 in August, 2002(Tr. at 307-35.); medical records from Day Surgery Center (Tr. at 344-360.); and notes from Dr. Greenberg, who performed a neurological consultation in January, 2004. (Tr. at 378-82.)

On September 12, 2002, post-operatively, Dr. Carson noted that Claimant had a negative straight leg-raising test, a normal 5/5 motor examination throughout, normal deep tendon reflexes, and normal sensation except for patchy numbness of the right ankle. (Tr. at 313.) In October and November, 2002, examination revealed essentially the same results with the exception of decreased sensation over the right medial foot and heel in November. (Tr. at 311-12.) For continued back pain, Claimant had epidural injections. (Tr. at 346-57, 307.)

In March, 2003, Dr. Carson noted that Claimant did well post-operatively, but that after wrestling with his son, he developed low back and right leg pain. (Tr. at 307.) Claimant reported constant right low back pain with right calf pain on certain movements. (Id.) He indicated that prolonged sitting and standing exacerbated the pain. (Id.) Physical exam revealed a steady gait, a slight decreased sensation over the right medial foot and heel, negative straight leg-raising

21

bilaterally, and an ability to do a deep knee bend. (Id.) Dr. Carson noted that it was encouraging that Claimant's pain had improved and that the back pain should continue to improve with time. (Id.) He further noted that no further surgery was indicated at that time. (Id.) Dr. Carson recommended conservative treatment with physical therapy, including stretching, strengthening, and conditioning, and to follow up on an as needed basis. (Tr. at 307-08.) In September, 2003, Claimant fell and injured his back. (Tr. at 202, 346.) Straight leg-raising test was positive at 70 degrees on the right, and it was noted that Claimant was maximally medically treated. (Tr. at 346.)

On January 22, 2004, Claimant underwent a neurological consultation by Dr. Greenberg, at which time he reported recurrent radicular right leg pain after some vigorous "wrestling-like activity" with his step-son. (Tr. at 380-82.) On examination, Claimant had a straight leg-raising test at 70 degrees with pain in the right lower extremity, weakness of the right lower extremity, decreased sensation to pinprick in the S1-L5 dermatone of the right lower extremity, an antalgic gait in the right lower extremity, and decreased range of lumbar motion, but normal tandem, heel, and toe walk. (Tr. at 381.) Dr. Greenberg advised Claimant to refrain from vigorous physical activity and prolonged periods of sitting or driving until a MRI scan could be performed. (Id.) On February 4, 2004, a MRI of the lumbar spine revealed no evidence of disc recurrence at L5-S1 or herniated disc at any level. (Tr. at 378.) Likewise, there was no indication of stenosis or abnormal pathology, and there was a normal myelographic sequence without evidence of nerve root amputation. (Id.) Dr. Greenberg therefore, advised that there was no indication for any form of further surgical intervention. (Tr. at 379.)

In his decision, the ALJ summarized the evidence of record, including Dr. Kropac's treatment records and opinion and the opinions of the state agency physicians. (Tr. at 28-29.) With

22

respect to Dr. Kropac, the ALJ noted that he was Claimant's treating orthopedist, but accorded his opinion little weight. (Tr. at 28.) The ALJ determined that Dr. Kropac's opinion that Claimant could perform less than sedentary work was not supported by his clinical notes, his conservative treatment of Claimant, the Claimant's MRI, and the clinical observations of other treating physicians. (Id.) He noted that Dr. Kropac based his opinions on Claimant's subjective complaints of pain rather than on the objective findings upon examination. (Id.) Particularly, Dr. Kropac noted Claimant's complaints that prolonged sitting or standing caused increased back pain, as well as any bending, stooping, or standing. (Id.)

Contrary to Claimant's allegations, the ALJ properly set forth the reasons for not according great weight to Dr. Kropac's opinion. Dr. Kropac's clinical notes reflected Claimant's subjective complaints and essentially normal physical findings. However, as the ALJ found, Dr. Kropac opined that Claimant was limited to performing less than sedentary work, based on what appears to be Claimant's subjective complaints rather than his observations. Likewise, Claimant's latest MRI did not reveal any significant herniation or disc recurrence to support Dr. Kropac's extreme limitations. As discussed above, Dr. Kropac's opinion is at odds with the clinical observations and physical findings of the other treating physicians as well. Though the ALJ did not discuss in detail these factors in the section where he accorded little weight to Dr. Kropac's opinion, he previously summarized the medical evidence and made his conclusion in weighing the medical opinions. The Court finds nothing wrong with the ALJ's analysis. The ALJ properly gave greater weight to the opinions of the state agency physicians because their opinions were consistent with the evidence of record as a whole. Accordingly, the undersigned finds that the ALJ's decision to give little weight to Dr. Kropac's opinion is supported by substantial evidence.

3. <u>Mental Impairment</u>.

Finally, Claimant alleges that the ALJ erred in failing to find that he had a severe mental impairment. (Document No. 10 at 17-19.) He asserts that the ALJ rejected his depression as a severe impairment because Dr. Lilly's opinion was inconsistent with the evidence in the file, but fails to note that Dr. Lilly mentioned the condition as early as April, 2003. (<u>Id.</u> at 17-18.) He asserts that the ALJ improperly concluded that Dr. Goudy's opinion was inconsistent with the evidence of record because Claimant had never been hospitalized or engaged in psychotherapy. (<u>Id.</u> at 18.) Claimant maintains however, that this statement goes to the onset of the mental impairment, and not whether such a condition existed in the first place. (<u>Id.</u>) Claimant further asserts that his failure to get treatment relates to the ability to pay for such treatment. (<u>Id.</u>)

The Commissioner asserts that the only evidence of record of a mental impairment came from Dr. Goudy, to whom Claimant was referred by his attorney. (Document No. 11 at 15.) As the ALJ properly found, Dr. Goudy's report was inconsistent with the evidence of record. (<u>Id.</u>) The Commissioner notes that Claimant had no history of psychiatric treatment, therapy, or hospitalizations. (<u>Id.</u>) Furthermore, as the ALJ noted, Dr. Goudy contradicted himself when he noted that Claimant's concentration was markedly impaired, but opined that he should pursue a GED degree. (<u>Id.</u>) Even after Dr. Goudy's report, the Commissioner notes that Claimant did not seek treatment for a mental condition. (<u>Id.</u>) The Commissioner therefore, asserts that "the ALJ properly gave little to no weight to this one-time, attorney-referred examination report and correctly found that this impairment, if it existed at all, was not severe as defined by the regulations." (<u>Id.</u>)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work

24

activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

Regarding Claimant's mental impairments, the evidence of record reflects that Claimant underwent a psychological evaluation by Tony R. Goudy, Ph.D., at the request of Claimant's attorney. (Tr. at 387-93.) Claimant complained of severe and chronic low back pain, as well as depression over the last four years. (Tr. at 387.) Because of his depression, Claimant reported extreme irritability, which caused significant impairment in his social functioning and the dissolution of his marital relationship. (Id.) He reported significant anhedonia, as he no longer enjoyed drawing and fishing; increased appetite and weight gain; poor sleep; decreased energy; feelings of guilt and worthlessness; difficulty concentrating; difficulty controlling his emotions; and suicidal ideation, but denied current intent or plan. (Id.) On mental status exam Claimant appeared

25

uncomfortable in his seat and was reserved, but cooperative. (Tr. at 389.) His speech and communication was invariably relevant, spontaneous, and coherent; he denied perceptual disturbances; he was well-oriented to time, place, person, and circumstance; his immediate memory was intact, but his recent and remote memories were mildly impaired; his concentration was markedly impaired; his judgment and insight were intact; and he functioned in the low average range intellectually. (Tr. at 389-90.) Dr. Goudy diagnosed depressive disorder NOS and adjustment disorder with anxiety, and assessed a GAF of 55-60.[2] (Tr. at 391.) He opined that Claimant's mental impairments resulted in mild to moderate restrictions in activities of daily living and social functioning and in marked impairments in maintaining concentration, persistence, and pace. (Id.)

Claimant testified that the pain caused him frustration and that dealing with the pain drove him crazy. (Tr. at 450.) He stated that pain stressed him out because he used to be able to exercise but no longer could. (Id.) He testified that the pain contributed to the dissolution of his marriage in that he could not work or perform work around the house. (Id.) He further testified that he had difficulty going to and staying asleep, and that he took Ambien to help him sleep. (Tr. at 451-52.) He stated that it was difficult for him to concentrate with the pain. (Tr. at 452.)

The ALJ noted Claimant's allegations of depression and anxiety but determined that such impairments were non-severe impairments because the medical evidence did not reveal any treatment for mental impairments. (Tr. at 24.) He summarized the psychological evaluation of Dr. Goudy, but found that his report was inconsistent with the evidence of record. (Tr. at 24-25.) The

---

[2]     The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

ALJ noted that Claimant had no history of psychiatric hospitalizations and never engaged in psychotherapy. (Tr. at 25.) As the Commissioner noted, the ALJ found an inconsistency in Dr. Goudy's report. (Id.) He opined that Claimant's concentration was markedly impaired, but recommended that he pursue a GED degree and noted that Claimant's intellect superseded his limited education. (Id.) The ALJ concluded that if Claimant "was mentally as significantly impaired as Dr. Goudy opined, one would expect similar reports and findings by his treating and examining physicians and even a referral to a mental health professional." (Id.) However, after Dr. Goudy's report, Claimant failed to pursue any treatment of his mental condition, but obtained a prescription for Viagra to improve his sex life. (Id.)

Though Claimant asserts that Dr. Lilly prescribed Zoloft as early as April, 2003, for situational depression, the record contains limited information in this respect. On April 7, 2003, Dr. Gail Smythe, M.D., diagnosed situational depression and gave Claimant a sample pack of Zoloft. (Tr. at 351.) On October 10, 2003, a follow-up note by Dr. J. K. Lilly III, M.D., reflects Claimant's medications to include Zoloft, but makes no mention of Claimant's depression, or any functional limitations resulting therefrom. (Tr. at 346.) Thus, as the ALJ noted, the first significant evidence of Claimant's depression was in the form of Dr. Goudy's psychological evaluation. Claimant reported to Dr. Goudy that he had experienced depression for four years, but as the ALJ noted, the evidence of record failed to demonstrate a significant mental impairment. Other than taking Zoloft, Claimant did not seek treatment for his mental impairment. Though Claimant attempts to allege that he lacked the funds to seek treatment, the record demonstrates that he obtained a prescription for Viagra. Furthermore, there is no clear evidence that he sought mental health treatment but was denied due to the lack of funds. Thus, the undersigned finds Claimant's argument in this respect to

27

be without merit. The ALJ properly explained his reasoning for discounting Dr. Goudy's opinion, primarily based on the inconsistencies in his finding of a marked impairment in concentration. There is little evidence of record to support any significant functional limitations resulting from Claimant's mental impairments, and therefore, the undersigned finds that the ALJ's decision that Claimant's depression and anxiety were non-severe impairments is supported by substantial evidence.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 11.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 30, 2009.

R. Clarke VanDervort
United States Magistrate Judge

28